IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| DAVID S. HANSEN | ) | |
| and MILDRED R. HANSEN, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 101043C |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This is an appeal filed by Plaintiffs challenging certain adjustments made by Defendant

to their 2006 state income tax return. Defendant's adjustments concern numerous deductions

claimed by Plaintiffs in calculating their 2006 Oregon tax liability, which came to $0 on both

their original and amended returns (Oregon Form 40). (Ptfs' Exs 28, 29-1.)

Trial in the matter was held in the courtroom of the Oregon Tax Court on September 29,

2011. Plaintiffs were represented by Greg Ripke (Ripke), certified public accountant. Plaintiffs

did not appear at trial. Defendant was represented by Dane Palmer (Palmer).

I. STATEMENT OF FACTS

Plaintiffs personally prepared their tax returns for the years 2005, 2006, and 2007. The

returns showed no tax liability each year. Defendant audited Plaintiffs' 2005 and 2006 returns,[1]

and during the course of that audit, Plaintiffs hired Ripke to prepare an amended return for

2006.[2] Plaintiffs' amended 2006 return was submitted as Plaintiffs' Exhibit 29. Defendant

_____

[1] Plaintiffs' 2007 return may also have been audited, but there was no testimony or other evidence
presented on the matter, and it is not relevant to the resolution of this appeal.
[2] Ripke stated during opening statements that he prepared an amended return for 2007. Again, that is not
relevant to the matter currently before the court, which deals with Plaintiffs' 2006 state tax liability.

continued the 2006 audit, examining the 2006 amended return and other documents Plaintiffs provided. Defendant concluded Plaintiffs' 2006 Oregon tax liability was $5,166, plus a penalty of $1,033 for substantial understatement of income, and a post amnesty penalty of $1,291. (Def's Exs F1, F15.)

At the time of trial, the facts were as follows. Plaintiffs operate an adult nursing and residential care home on approximately 40 acres of land in Eugene, Oregon. Plaintiffs purchased the property on or about the year 2000. There are outbuildings on the property. Plaintiffs have some farm animals on the property, plus farm equipment (including a tractor), and the parties agree there was some farming activity. According to Ripke, Plaintiff David Hansen was at one time a construction contractor, but became disabled and in need of another line of work. Plaintiffs chose to provide residential adult foster care in their home.

On their amended 2006 return Plaintiffs reported a $0 tax liability based on a federal adjusted gross income (AGI) of $14,116, Schedule A itemized deductions of $11,701, for an Oregon taxable income of $2,415, resulting in a tax before credits (Oregon Form 40, line 31) of $123. (Ptfs' Ex 29.) That tax was erased by Plaintiffs' two dependent exemption credits of $159 per person ($318 total exemption credit). (Ptfs' Ex 29-1.) Plaintiffs' federal AGI, which is the starting point for determining Oregon taxable income and ultimately whether any tax is due to the state, was predominately net business income. Plaintiffs did report $31 of interest income. (Ptfs' Ex 29-5.)

Plaintiffs reported federal Schedule C business income of $126,854, and $50,786 of business expenses (excluding those associated with the business use of their home), for a tentative profit on line 29 of $76,068. (Ptfs' Ex 29-8.) Plaintiffs then subtracted $60,912 (Schedule C, line 30) for expenses related to the business use of their home (Form 8829). (Ptfs'

Ex 29-11.) Those expenses were based on Plaintiffs' determination that 88.09 percent of their home was regularly and exclusively used for business (on a square footage basis as required by form 8829). (*Id.*) The resulting business income (federal Form 1040, line 12) was $15,156. (Ptfs' Ex 29-8.) Plaintiffs calculated a total income of $15,187 by adding the $31 of interest income to the $15,156 net business income. (Ptfs' Ex 29-5) Plaintiffs then subtracted $1,071 for self-employment tax, and arrived at a federal AGI of $14,116. (*Id.*)

Defendant audited that return, increasing Plaintiffs' Schedule C net profit by $67,155, from $15,156 to $82,311, (Def's Exs F1, F7.) The parties agree that Plaintiffs had $126,854 in gross receipts. Defendant decreased Plaintiffs' total expenses, before expenses for business use of home, by $31,570, from $50,786 to $19,216, and Plaintiffs' Form 8829 expenses for business use of home by $35,585, from $60,912 to $25,327. (Def's Ex F7.) Defendant added an additional $823 of income from the distribution of the pension plan in accordance with Internal Revenue Code (IRC) section 61 and ORS 316.048. (Def's Ex F8.) That increase in income in turn increased Plaintiffs' deduction for one-half of their self-employment tax from $1,071 to $5,815, for a net adjustment of $4,744. (Def's Ex F9.) Defendant calculated Plaintiffs' Oregon tax to be $5166, plus a penalty of $1,033 pursuant to ORS 314.402 for substantial understatement of taxable income (resulting from the approximately $67,000 income increase), and a 25 percent post-amnesty penalty in the amount of $1,291. (Def's Exs F13 – F15.)

The parties agree to gross revenues of $126,854, and to a business deduction of $3,894 for car and truck expenses. (Def's Ex F7.) The parties also agree on the dollar amounts for Plaintiffs' mortgage interest, property taxes, and homeowners insurance. They disagree on the remainder of the adjustments Defendant made to Plaintiffs' 2006 return.

/ / /

Additionally, the parties disagree on number of residents receiving nursing and foster care services; Plaintiffs claim six and Defendant asserts that there were only five. The disagreement is over a resident named "Sue," who Plaintiffs' representative Ripke insisted at trial was a service recipient. However, Plaintiffs did not testify at trial and there is evidence that conflicts with Ripke's claim. It appears that the occupant named Sue paid some money to live in Plaintiffs' home in 2006 and, according to Ripke, that individual "occasionally" helps care for the residents living in the home. Plaintiffs are only licensed to care for five foster care patients. The court concludes Plaintiffs had five residents in the home receiving services. That is the same conclusion this court reached in Plaintiffs' 2005 appeal. *See Hansen v. Dept. of Rev.* (*Hansen*), TC-MD No 081122D, WL 3089297 at *12 (Sept 29, 2009).

The parties also disagree on total number of people living in the home. On the evidence before it, the court concludes that there were nine people living in the home and not eight as Ripke contends. That is a fairly easy determination to make because Ripke acknowledges that both Plaintiffs lived in the home, that Sue lived in the home, and that Plaintiffs had five foster care patients. There is some dispute about whether Plaintiffs' son was in the home, but, as explained below, Defendant asserted the son does live in the home and introduced evidence to support that claim, and Plaintiffs produced no evidence to the contrary. Accordingly, the court concludes that the total number of people living in the home in 2006 was nine.

## II.    PARTIES' POSITIONS

Ripke stated during his opening statement that Plaintiffs claimed income in 2006 from their foster care business was approximately $12,000. (*See* Ptfs' Ex 8.) Defendant says their income was approximately $82,000. (Ptfs' Ex 8-1.) The difference is about $70,000. Of that amount, about $30,000 is disallowed by Defendant because Defendant feels there is inadequate

substantiation. Ripke contends Defendant disallowed another $374 due to an alleged lack of business purpose. Ripke argued that Defendant deemed another $4,000 to be unsubstantiated, but Ripke contended that expense could be proven. Defendant disallowed another $23,000 of "repairs" on the grounds that it was for a "capital addition." Ripke disputes that adjustment, arguing that there are no facts in evidence showing that there was an addition to the home in 2006. There is a final $3,000 of adjustments which Ripke contends are "a matter of law," an amount Ripke believes Plaintiffs are entitled to deduct. The total amount of those adjustments is approximately $59,000 according to Ripke. Of that amount, Ripke argued that $11,000 is an "allocation of expense issue" based on a disagreement between the parties as to the total number of people living in the home and the number residing there as foster care patients.

Defendant's representative Palmer argues that, in preparing Plaintiffs' 2006 return, Ripke prepared a general ledger using bank statements and debit card statements, without proper regard to the underlying receipts. Palmer reviewed the receipts provided during that audit and found that more than 37 percent of those receipts were for food and supplies, and that Plaintiffs received cash back on some of those transactions. Palmer contends that Ripke's reconstructed statements therefore overstate expenses because they include the cash Plaintiffs received back from the merchants (amounts not tied to any expense on the receipt because nothing was purchased). Palmer further testified that greater than 61 percent of the receipts for food and supplies were totally or partially for personal use items, but nonetheless fully deducted by Plaintiffs on the 2006 amended return. Palmer argued that Ripke's method of recordkeeping is unreliable and flawed, and not in accord with IRC sections 162 and 274. Palmer concluded his opening statement by asserting that the issue is not proof of payment but rather business purpose.

/ / /

Ripke contends that Plaintiffs' return constitutes their claim of revenue and expenses and they were in court to prove their claim, but that the state has the burden of proving its claims with regard to those matters. Ripke then argues that Defendant has failed to present any evidence to support its claims. Ripke indicated there are also issues regarding Plaintiffs' Schedule A deductions and penalties and interest imposed by Defendant.

III.  ANALYSIS

A.  *Introduction and overview*

The Oregon legislature made Oregon's personal income tax system identical to the federal counterpart for purposes of determining Oregon taxable income, with the exception of certain modifications deemed necessary by the legislature and set out in the statutes. ORS 316.007 (setting forth the general contours of the state's tax policy).[3] Thus, the federal definitions for income and expenses (both deductions and credits) apply.

Briefly stated, and as relevant to this case, IRC section 162 allows a deduction for "ordinary and necessary" business expenses, while section 262 prohibits the deduction of most personal and family expenditures. Additionally, it must be borne in mind that any deductions taken by a taxpayer are a "matter of legislative grace" and the burden of proof (substantiation) rests on the individual claiming the deduction. *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 SCt 1039, 117 LEd 2d 226 (1992). *See also* ORS 305.427 (providing that the burden of proof in the Oregon Tax Court is a preponderance of the evidence and falls upon the party seeking affirmative relief). Finally, IRC section 6001 requires that taxpayers keep records. Taxpayers are thus required to provide "records showing that a person is entitled to deduct, credit, or capitalize basis in, items claimed in calculating tax liability. One of the elements showing

_____

[3] Unless noted otherwise, all references to the Oregon Revised Statute (ORS) are to 2005.

entitlement to a deduction, credit, or basis is proof of payment of an amount." Rev Proc 92-71, 1992-35 IRB 17.

Plaintiffs operate an adult nursing and residential care home out of their personal residence. The parties agree that Plaintiffs received $126,854 in gross receipts from the operation of their business. The parties disagree on the vast majority of expenses Plaintiffs claimed and the percentage of such expenses Plaintiffs are allowed to claim. The court will begin by addressing the business expense items in dispute, the proper allocation of those expenses, Plaintiffs' allowable personal expenses, and conclude brief discussion of additional income added by Defendant, an adjustment to the allowable self-employment tax, and two penalties for substantial understatement of income.

Plaintiffs deducted $111,698 for direct Schedule C business expenses ($50,786) and expenses for the business use of their home ($60,912). Plaintiffs therefore reported $15,156 as business income on line 12 of their amended 2006 federal 1040 return. Plaintiffs then subtracted $1,071 for self-employment tax to arrive at a federal AGI of $14,116. Plaintiffs then deducted $11,701 in Schedule A itemized deductions, including $8,177 in medical expenses. Using those numbers, Plaintiffs calculated an Oregon tax before credits of $123, which was completely eliminated by the two dependent exemption credits they claimed for themselves ($159 each) in the amount of $318. (Ptfs' Ex 29-1.) As indicated above, Defendant adjusted Plaintiffs' return and determined that they owed a tax of $5,166 plus penalties. (Def's Exs F1, F15.) Plaintiffs have appealed that determination.

Plaintiffs previously filed an appeal with this court challenging deductions made by Defendant to their 2005 Oregon return. This court's decision in that case, *Hansen*, TC-MD No 081122D, gave a detailed and comprehensive explanation of the various laws applicable to

business expense deductions and relevant substantiation and burden of proof requirements for a nearly identical list of expenses.

The court also noted in the Decision on the appeal for the earlier year (2005) that the nature of Plaintiffs' business requires multiple allocation methods for different claimed expenses, not only to differentiate between personal, nonbusiness expenditures (that are not deductible) and deductible business-related expenses, but also to isolate the allowable business-related portion of those expenses Plaintiffs incurred that provided a benefit partially related to the business and partially to Plaintiffs' personal life. The business-related expenses required separate allocation methodologies.

B.      *Allocation of certain expenses*

Certain expenses, such as food and household utilities, are deducted on a percentage basis derived by dividing the number of patients in the home receiving services by the total number of people living in the home (*e.g*., food and utilities), while other business expenses more directly related to the home itself (*e.g*., repairs, depreciation, mortgage interest, property taxes, and insurance) are properly deducted based on the percentage of the home devoted to nursing and residential care. In the 2005 appeal the court noted that the nature of the use of the home required for the "business use of home" deduction involving licensed residential care facilities is "regular" use as opposed to "exclusive." IRC section 280A(c)(4)(A). *Hansen*, TC-MD No 081122D at 19. The court accepted Plaintiffs' evidence on the size of the home and concluded that the amount of the home utilized regularly for the business was 67 percent. (*Id*. at 21.) The court has reviewed the evidence in this case and concludes that the appropriate percentage is 67 percent.

/ / /

As for the deductions allowed based on patient to total household size, the court finds the appropriate ratio to be 55.5 percent, based on a finding there were five service recipients (foster care residents) and a total of nine people living in the home. That was the court's determination for 2005, the number used by Defendant during audit, and Defendant's position at trial. Plaintiffs did not testify, and Ripke's assertion of six patients and eight residents finds no support in the evidence. The parties agree on five foster care residents. (Ptfs' Ex 9-1.) They also agree that both Plaintiffs lived in the home. That brings the total to seven people. Ripke contends there were eight people on the home while Palmer insists there were nine.

The two individuals in dispute are Plaintiffs' son and an individual named Sue. Plaintiffs acknowledge that Sue lived in the home. Ripke referred to Sue at trial as a renter and indicated that she pays to live in Plaintiffs' home. Ripke further stated that it was his understanding that Sue's brother paid Plaintiffs $1,500 per month for Sue to live there, and that Plaintiffs "gave" Sue $500 to "live on." Finally, Ripke stated that Sue occasionally helps care for the residents in the home. Palmer responded that there was no proof that Plaintiffs had an obligation to, or in fact did, provide care for Sue. While the evidence is far from clear on the matter, the court concludes Sue lived in the home in some capacity other than as a foster care patient.

The other individual in dispute, for purposes of determining the total household size (number of people living in the home) is Plaintiffs' son, Daniel. Plaintiffs were aware that this was an issue well before trial. Ripke argued that there was no proof the son lived in the home, to which Palmer responded that he visited the home in 2008 and the son was living there. More importantly, Palmer introduced into evidence a copy of the son's time card for the period ending January 31, 2006, for a job Daniel held at Kelly's True Value. (Def's Ex O13.) That document lists Daniel's address as 26901 Pickens Rd., Eugene, which is Plaintiffs' home address. On the

evidence before it, the court concludes the son lived in the home. Therefore, the total number of individuals living in the home (i.e. total household size) is nine (both Plaintiffs, their son, a renter Sue, and 5 foster care residents).

C.    *Business expenses*

      1.    *Non-allocable (i.e., completely deductible; no apportionment required)*

            a.    Car and truck expenses

Plaintiffs claimed $3,894 for car and truck expenses on their federal Schedule C. (Ptfs' Ex 29-8.) Plaintiffs' deduction was based on the applicable federal rate of $0.445 (45 cents) per mile. Defendant allowed that amount during audit and accepts it for purposes of this appeal. (Def's Ex F2.) Such expenses are allowed under IRC section 162 and the court will allow the amount claimed. The court will accept Defendant's determination. Plaintiff did not provide any evidence to show that an additional amount should be deducted.

            b.    Other interest

Plaintiffs claimed $913 on the line 16b of their Schedule C as "Other interest." (Ptfs' Ex 29-8.) Ripke stated at trial that he concluded that 83 percent of Plaintiffs' miles were business related, and, given that Plaintiffs owed just under $21,000 on their business vehicle, he estimated that they paid interest at a rate of 6 percent, or approximately $1,100. Multiplied by the business use of the vehicle (83 percent), Ripke calculated an estimated automobile interest charge of $913. (Ptfs' Ex 19-6.) There is no evidentiary support for the $913 deduction and the court will not allow it.

            c.    Telephone

Plaintiffs deducted $3,572 for "utilities" on their federal Schedule C. (Ptfs' Ex 29-8.) Defendant determined that $711 was directly related to Plaintiffs' home

telephone landline. (Def's Ex. F4.) Ripke's reconstructed expense ledger lists purported expenses for Internet (Juno), telephone (Qwest and Sprint), plus expenditures at RadioShack, and Circuit City. (Ptf's Ex. 23-4.) Of that amount, Ripke contends $955 is for the Qwest home telephone line. There are no receipts or copies of the bills. The court therefore accepts Defendant's determination allowing $711.

####### d. Advertising

Plaintiffs reported $298 for advertising on their federal Schedule C. (Ptfs' Ex 29-8.) Defendant did not allow any amount for advertising. (Def's Ex F2.) Plaintiffs' only form of proof is a copy of the December 2006 credit card statement showing a charge of $298 paid to "Providian." (Ptfs' Ex 12.) Plaintiffs have not provided any proof that the payment was for an advertisement. Plaintiff did not provide a copy of the actual advertisement or sworn testimony about any such advertisement. Moreover, assuming the amount spent was for some type of advertisement, there is no proof that the advertisement was for a deductible business-related purpose. Given the statutory burden of proof requirements in ORS 305.427 and the general recordkeeping requirements of IRC section 6001, the court will not allow any amount for advertising.

####### e. Other expenses

Plaintiffs reported $5,682 in "Other expenses" on line 27 of their federal Schedule C. (Ptfs' Ex 29-8.) That category consists of $4,090 of monies paid for alleged outside services consisting of casual, part-time labor (persons paid to care for the residents when Plaintiffs were away or otherwise unable). (Ptfs' Ex 29-9.) Another $1,218 was deducted for arts and crafts, and the balance of this expense category, $374, is identified as bank fees. (*Id*.) The Defendant disallowed each of these deductions and the court agrees as follows.

(1)     Casual labor

Of the amount reported as "Other expenses," $4,090 is allegedly attributable to outside labor services Plaintiffs' used to help them operate their business. Defendant denied the entire amount for lack of substantiation because the payments were allegedly made in cash. The only "evidence" of the alleged expense is a handwritten list titled "Hired help," followed by two columns of numbers, a few of which have a dollar signs next to them. (Ptfs' Ex 11; Def's Exs M56, M57.) There are no dates for where the services were provided, the names of the individual(s) performing the services, etc. (*See id*.) Moreover, because the payments were allegedly made in cash, there is no independent substantiation such as canceled checks. Finally, Plaintiffs did not testify so there is not even sworn testimony regarding this alleged expense. Ripke, Plaintiffs' accountant, stated during trial that his clients are a two-person operation and occasionally hired outside help for short periods of time while they are away. The court will not allow any amount claimed expense because of the lack of substantiation.

(2)     Bank fees

Looking first at the bank fees, Plaintiffs did not have a separate bank account for their home business, choosing instead to commingle their business and personal finances. There is therefore no way to determine whether the claimed expenses were business or personal. As with so many other items, the deduction for bank fees is not adequately substantiated. Plaintiffs provided a computer-generated ledger that simply lists a number of service charges imposed by Key Bank. (Def's Ex M25.) There are two significant charges, both in early August, that amount for the vast majority of the total amount claimed ($201.75 on

/ / /

August 4, 2006, and $101 on August 6, 2006). Plaintiffs have not provided any persuasive evidence that these charges are business related.

(3)     Arts and crafts

As for the arts and crafts deduction, Plaintiffs provided a general ledger that appears to be computer-generated. (Def's Ex M24.) Defendant denied the entire deduction for lack of substantiation, because in reviewing Plaintiffs' receipts, Defendant's auditor Palmer noted that Plaintiffs coded the receipts for the craft items with a "P" for personal. The court agrees and finds that this expense must be denied due to inadequate substantiation or proof of a business purpose.

f.     Dues, publications, and licensing

Plaintiffs deducted $647, comprised of $184 for "licenses and permits," and $463 for dues and publications. (Ptfs' Exs 8, 15-1.) That amount appears on Plaintiffs' Schedule C, line 23, as "Taxes and licenses." (Ptfs' Ex 29-8.) Defendant did not allow any of the amount claimed. (Def's Ex F3.) Plaintiffs submitted a reconstructed ledger reflecting items for which they were either billed or paid by credit card. (Ptfs' Ex 15.) There are no receipts to prove any of the payments are actually made. Among the items included are subscriptions to Hot Rod magazine, "Street Rodder," and something called "TATTOO." The court does not find the evidence submitted to be sufficiently persuasive to allow Plaintiffs any of the $647 amount claimed. The court will therefore not allow any deduction for this category.

g.     Office expenses

Plaintiffs claimed $1,043 for office expenses. (Ptfs' Exs 8, 16, 29-8.) Exhibit 16 is a reconstructed operating ledger purportedly reflecting purchases from various office supply stores totaling $1,042.88. Again, there are no receipts to substantiate any of the

items listed in Plaintiffs' Exhibit 16. Defendant indicates in its audit that Plaintiffs supplied receipts substantiating $328 which Palmer was willing to allow as a deduction. (Def's Ex F3.) The court is willing to allow the $328 Defendant found to be substantiated. That amount is deductible on Plaintiffs' Schedule C at 100 percent (*i.e.*, no need for apportionment between business and personal as office expenses are incurred for business purposes).

        h.      Accounting

        Plaintiff reported $155 as deductible expenses for accounting. (Ptfs' Ex 8, 17.) The deduction is apparently attributable to the purchase of Turbo Tax software. (Ptfs' Ex 17.) Defendant disallowed the deduction during audit, indicating that Plaintiffs provided no documentation to substantiate the claimed expense. (Def's Ex F3.) Palmer reiterated that position at trial. Ripke did not present any receipts or other type of evidence at trial to substantiate this deduction. The ledger, like all the others, is a computer-generated document and, without either receipts or testimony from the taxpayers, the court simply cannot allow a deduction for accounting.

      2.     *Allocable expenses*

        a.      Allocated by ratio of foster care residents to total household size

           (1)      Utilities

        Plaintiffs deducted $7,166 for utilities. (Ptfs' Exs 8, 29-11.) Included in that category is electricity, internet, garbage, and satellite television. There was virtually no discussion of this item during trial. Defendant determined during audit that Plaintiffs were entitled to claim $6,870 for utility expenses. (Def's Ex F4.) Thus, the parties are not too far apart in terms of the dollar amount of the expenses allowed. However, Plaintiffs reported the expenses on federal Form 8829, Expenses for Business Use of Your Home,

attributing 88.09 percent of the home to business use whereas Defendant correctly determined that the appropriate percentage to apply should be based on the occupancy ratio (number of foster care residents versus total household size), and used the figure of 55.5 percent. (Ptfs' Ex 29-11; Def's Ex F4.) As indicated above, the court has concluded that the correct percentages 55.5 percent. Accordingly, the allocated amount of the deduction becomes $3,813. Defendant did add in the $711 for Plaintiffs' home telephone at 100 percent, for a total allowable utilities deduction of $4,524. (Def's Ex F4) The court has separated the $711 telephone deduction, as discussed above.

(2)     Household cleaning supplies ("supplies")

Plaintiffs deducted $1,785 for "supplies" on their Schedule C. (Ptfs' Ex 29-8.) By way of proof, Plaintiffs submitted a reconstructed ledger showing payments to Pacific Rubber, Ross Stores, Industrial Source, etc. (Ptfs' Ex 18.) The supplies at issue are for household cleaning. A review of the numerous receipts Plaintiffs provided Defendant and submitted into evidence by Defendant at trial shows that Plaintiffs typically purchased supplies at the same time they bought groceries. As will be discussed in more detail below, the receipts for such items include a mixture of arguably business and clearly personal items. Defendant reviewed the receipts during the audit and included household cleaning supplies with the "meals and entertainment" deduction. Plaintiffs treated those items similarly on their expense ledger. (Ptfs' Ex 8.) The court will therefore defer discussion of this matter to that category.

(3)     Meals (food and household supplies)

On their general handwritten ledger, Plaintiffs indicate that $33,627 was spent on "Food & H/H Supplies." (Ptfs' Ex 8.) On their federal amended Schedule C Plaintiffs reported $25,760 for "Deductable meals and entertainment." (Ptfs' Ex 29-8.)

Plaintiffs contend that they are entitled to deduct 75 percent of their expenses based on the ratio of six foster care residents to eight total household residents. Ripke stated that he did not have any receipts to submit into evidence, but was certain that his clients had the receipts if they were necessary. Ripke submitted only a general reconstructed ledger. (Ptfs' Exs 20-1 – 20-8.) Plaintiffs' total adds up to $33,626.61. (Ptfs' Ex 20-8.)

Defendant indicates in its audit report that Plaintiffs presented numerous receipts during the audit phase of this case. (Def's Ex F3.) Defendant reviewed those receipts and determined that Plaintiffs had substantiated allowable food expenses of $11,824. (*Id.*) Applying the 55.5 percent ratio, Defendant determined Plaintiffs were entitled to deduct $6,562. (Def's Ex F4.) During the trial, Palmer walked the court through a representative sampling of the receipts Plaintiffs provided. Those receipts revealed that a considerable amount of the items Plaintiffs purchased during their numerous trips to the various grocery and household supplies outlets were personal items that the adult foster care residents would likely not use, and that would not be properly deductible business defenses. For example, the receipts reveal purchases for children's slippers, gum, a camera, a 30 caliber brush, earrings, a 14 carat gold chain, an air pistol, elk target and a model soft air rifle, crossman ammunition, youth pants, etc. (Def's Exs M77 – M136.) Plaintiffs also frequently took cash back on their purchases. (*See* Def's Ex M77.) The return of cash by the teller to a customer increases the total amount charged to the credit card, but obviously the cash does not represent money paid for items purchased and cannot be deducted. After reviewing the evidence, the court concludes Plaintiffs are entitled to a deduction for meals and entertainment, but that Defendant's calculations are more reliable. The court is aware that the amount allowed seems somewhat small for feeding five people for entire year. However, the court must make a decision based on evidence and, it is entirely possible that

Plaintiffs grow some of the food that was consumed by those living in the house. Plaintiffs live on a 40 acre parcel and Ripke acknowledged during trial that there was some farming occurring on the property. Accordingly Plaintiffs are allowed to deduct 55.5 percent of $11,824, or $6,562. Plaintiffs' Schedule C must be adjusted accordingly.

        b.     Allocated by percentage use of home for business (67 percent)

        (1)     Mortgage interest

The parties agree Plaintiffs had deductible mortgage interest in the amount of $34,357. Plaintiffs claimed the entire amount on their Form 8829. (Ptfs' Ex 29-11.) Defendant is correct in its determination that, while Plaintiffs are entitled to deduct the entire amount, only 67 percent of the amount spent can be reported on Form 8829. (Def's Ex F5.) That amount comes to $23,019. The balance, $11,338, is also deductible, but must be reported on Plaintiffs' Schedule A.

        (2)     Property taxes

Plaintiff reported deductible property taxes of $2,453. (Ptfs' Ex 29-11.) That expense, while entirely deductible, must be divided between the Form 8829 business expense, where 67 percent of the total can be claimed ($1,644), the balance of $809 being deductible on Plaintiffs' Schedule A.

        (3)     Home insurance

Plaintiffs also reported $992 for homeowner's insurance. (Ptfs' Ex 29-11.) Defendant allowed the entire amount as a deductible business expense. (Def's Ex F5.) The court will allow the deduction as a business-related expense, subject to the 67 percent allocation applicable to all expenses on Form 8829 (business use of home).

/ / /

(4)     Depreciation

Plaintiff reported $7,037 for depreciation on their federal Schedule C. (Ptfs' Ex 29-8.) According to a handwritten worksheet Plaintiffs prepared to delineate the items being depreciated, Plaintiffs included "residence, land, residence improve, generator, furnace, tractor, points, fees, shop, storage." (Ptfs' Ex 13-1.) Defendant determined during audit that Plaintiffs were allowed depreciation in the amount of $5,833, at 67 percent, for a total of $3,908. (Def's Ex F3.) Most of the testimony at trial (coming from the parties' representatives) concerned the tractor, some outbuildings used for farming, and Plaintiffs' determination that five of the 40 acres of land were allocable to the foster care. It is apparently Plaintiffs' position that the tractor is used to maintain the septic lines which service the foster care home, and that at least some of the outbuildings (shop and storage) were used for business purposes. Without the sworn testimony of either of the Plaintiffs, the court is unable to determine whether those items are business related. Accordingly, the associated depreciation will not be allowed. The court will allow depreciation in the amount determined by Defendant which, as adjusted based on the percentage of business use of the home, comes to $3,908.

(5)     Repairs and maintenance

As this court explained in its Decision regarding Plaintiffs' 2005 appeal, money spent on construction-type work to an income generating property can be deducted as a current year business expense under IRC section 162 (in which case the entire amount in the year the expenses incurred), or treated as a capital expenditure depreciated over the life of the improvement pursuant to IRC section 263. *Hansen*, TC-MD No 081122D at 22.

Plaintiffs reported $22,809 as repairs and maintenance on their federal Form 8829. (Ptfs' Ex 29-11.) Plaintiffs divide those expenditures into three categories: $19,663 as "direct" home

repairs, $1,279 for grounds maintenance costs, and $2,053 as equipment repair. (Ptfs' Ex 22-4, 22-5, 22-6.)

Defendant disallowed the entire amount based on the determination that Plaintiffs did not adequately substantiate the claimed expenses. (Def's Ex F5.) Defendant believes that the majority of those costs are associated with a major renovation Plaintiffs made to their home in 2005 and 2006, which involved the addition of two bedrooms and a hallway. Defendant's representative Palmer testified that he visited the property in 2008 and was shown a new addition to the house which, among other things, added two bedrooms and a hallway. Palmer testified that he was told by a woman who he understood to be on the property caring for the residence, that the addition was "recent." Ripke then advised the court during trial that the addition to the home occurred in 2007. Palmer raised an additional concern. Many of the receipts are made out to Hansen Brothers Construction, a company operated by Plaintiff Dave Hansen. Ripke stated during the early phase of the trial that Mr. Hansen had been a construction contractor but became disabled and needed to pursue a new line of work. The new line of work is the Plaintiffs' nursing and residential care business.

The court has reviewed the evidence and concludes that there is insufficient evidence to substantiate the business purpose for the amounts Plaintiffs deducted for grounds maintenance costs ($1,279), and equipment repair ($2,053). That reduces claimed repairs by $3,332, leaving only the $19,663 allegedly expended for the repair and maintenance of the home.

There are numerous receipts for home repair type items. However, given that Plaintiff Dave Hansen is in the construction business and Plaintiffs did not testify at trial, there is no way of knowing whether the reported expenses were for materials, supplies, and labor related to Plaintiffs' residential foster care home business, or repairs and maintenance to outbuildings and

DECISION  TC-MD 101043C                                                                              19

other property not associated with the home business like Plaintiffs' farming, construction business, or perhaps personal endeavors. On the evidence before it, the court will not allow any of the $19,663 claimed home repair expenses. Thus, none of the total amount claimed of $22,809 for repairs is allowed.

D.      *Personal expenses - medical*

IRC section 213(a) allows a deduction for medical expenses not paid for by insurance or otherwise to the extent that such expenses exceed 7.5 percent of federal AGI. Allowable expenses include medical care (*e.g.*, visits to the doctor), prescription drugs, and lab fees. IRC §§ 213(a), (b), (d).

Plaintiffs claimed a personal deduction for medical expenses on their Schedule A in the amount of $8,177. (Ptfs' Ex 29-7.) Using in adjusted gross income of $14,116, Plaintiffs calculated the allowable amount of medical expenses to be $7,118 (the amount exceeding 7.5 percent of AGI). (*Id.*) During the audit, Defendant reviewed a basket full of receipts and determined Plaintiffs had allowable expenses of $2,386. (Def's Ex F11.) However, because Defendant had significantly increased Plaintiffs' federal AGI (from $14,116 to $77,350), Defendant did not allow any deduction for medical expenses because the adjusted allowable amount of such expenses did not exceed 7.5 percent of the revised AGI. (Def's Exs F6, F11.)

Plaintiffs claimed $5,386 for prescription drugs. (Ptfs' Ex 24-1.) That exhibit is a reconstructed ledger listing dates, merchants, and amounts purportedly paid. Plaintiffs submitted virtually no receipts to substantiate the prescription drug medical expense deduction. Palmer allowed $83 during the audit and advised the court that Defendant had not changed its position since the audit. (Def's Ex F11.) Palmer again presented a representative sample of receipts he was given during the audit to demonstrate that Plaintiffs deducted food in the prescription drug

category, and appear to have simply deducted every drug store expenditure for which they had a receipt, whether or not a physician prescribed medication or a medical device was actually purchased. (Ptfs' Ex 24-1.) Palmer referred to an expense Plaintiffs' claimed for a purchase at Walmart on May 4, 2006, in the amount of $247.24. (*Id.*) The receipt for that activity, presented by Defendant, reveals no prescription drug purchases. (Def's Ex M122.) In fact, most if not all of the items on the applicable receipt are for food. (*Id.*) Plaintiffs' prescription drug ledger reflects another Walmart purchase on June 14, 2006, for $297.46. (Ptfs' Ex 24-1.) Palmer presented the Walmart receipt for that activity. (Def's Ex M117.) The receipt shows that the vast majority of the items purchased were for food, with a few household and outdoor items (*e.g.*, "tape fixture," "vanity waste," "lndry bskt"). (*Id.*) The receipt does not show any medications. Moreover, Plaintiffs took $40 cash back from the merchant. (*Id.*) Palmer briefly referenced other charges in the amounts of $383 and $272 which were for food rather than prescription drugs. Palmer indicated that he could, if the court wished, continue down that path, fully demonstrating that Plaintiffs had only given him receipts to substantiate $83 expended on prescription medications. Palmer did indicate that the food items disallowed as a medical expense were allowed under the meals and entertainment category. Again, Plaintiffs did not testify and their representative was unable to substantiate any additional prescription drug expenses. Accordingly, the court concludes Plaintiffs are only entitled to claim $83 for prescription drugs in 2006. That adjustment reduces Plaintiffs' medical expenses by $5,303, from $8,177 to $2,874. That amount does not come close to the code limitation which only allows amounts exceeding 7.5 percent of the federal AGI. Accordingly, Plaintiffs do not get a medical expense deduction.

/ / /

E.     *Other items*

1.     *Pension income*

Defendant added $823 of pension income for a taxable distribution from a pension plan based on information Defendant received from the Internal Revenue Service. (Def's Ex F8.) Plaintiffs' representative Ripke did not challenge that item at trial and the court will therefore add that amount as income under IRC section 61.

2.     *Self-employment tax*

IRC section 164(f) allows taxpayers to deduct one-half of any self-employment taxes paid under IRC section 1401. Plaintiffs deducted $1,071 for that tax on line 27 of their Federal form 1040. (Ptfs' Ex 29-5.) If there is any good news in this case for Plaintiffs, it is that the increase to Plaintiffs' self-employment income from $15,156 to $82,311 increases the deduction for self-employment tax by $4,744, from $1,071 to $5,815. (Def's Ex F10.) The court has reviewed Defendant's calculations and finds them to be correct and in accordance with applicable statutes and regulations. Accordingly, Plaintiffs' allowable self-employment tax deduction is $5,815, which is an increase of $4,744.

3.     *Substantial understatement of income penalty*

ORS 314.402(1) provides for a penalty of 20 percent of any underpayment of tax attributable to "a substantial understatement of taxable income * * *." A "substantial understatement of taxable income" occurs when a taxpayer understates his or her income by more than $15,000. ORS 314.402(2)(a). The calculation of the penalty is pursuant to a formula set forth in the applicable administrative rule, OAR 150-314.402(1). (Def's Ex F14.) The court finds the penalty applicable in this case because, as adjusted, Plaintiffs understated their income by more than $60,000. The tax due per Defendant's audit, as upheld by the court, is $5,166. A

20 percent penalty comes to $1,033, which is the amount Defendant imposed. (Def's Ex F15.) The penalty is upheld.

4. *Post amnesty penalty*

The final adjustment Defendant made to Plaintiffs' 2006 return was the imposition of a post amnesty penalty of 25 percent of the tax determined to be due after the adjustments made during the audit. The amount of the penalty is $1,291. (Def's Ex F15.) The penalty is imposed pursuant to OAR 150-305.100-(C)(7). It is based on an amnesty program, which includes a penalty for failure to participate, provided by Oregon Laws 2009, chapter 710, sections 1-9 (Senate Bill 880). Plaintiffs are subject to the penalty because they did not apply for amnesty during the period when application was allowed and they incurred a penalty for substantial understatement of income. The amount of the penalty is $1,291. The court has reviewed the matter and finds the penalty properly calculated and imposed.

### III.    CONCLUSION

After an exhaustive thoughtful analysis, the court concludes that Plaintiffs' appeal of Defendant's adjustments to their 2006 Oregon income tax return is denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' 2006 tax liability, as determined by Defendant, is $5,166.

IT IS FURTHER DECIDED that Plaintiffs are subject to a $1,033 penalty for substantial understatement of income.

/ / /

/ / /

/ / /

/ / /

IT IS FURTHER DECIDED that Plaintiffs are subject to a $1,291 post-amnesty penalty.

Dated this ____ day of July 2012.


_____
JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on July 24, 2012. The Court filed and entered this document on July 24, 2012.*